Filed 4/26/13  In re R.D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re R.D., a Person Coming Under the Juvenile Court Law. | B244541 (Los Angeles County Super. Ct. No. CK93836) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C.L.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Marguerite Downing, Judge.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Melinda A. Green, Senior Associate County Counsel for Plaintiff and Respondent.

## INTRODUCTION

C.L. (mother), the nonoffending parent of minor, R.D., appeals from the juvenile court's orders denying her request to terminate jurisdiction and requiring individual counseling for R.D. and conjoint counseling for R.D. and mother, if appropriate. According to mother, because she is a nonoffending parent, and because the offending parent, R.D.'s father, M.D. (father), waived reunification services and any further contact with R.D., there was no factual basis to support the disposition order requiring counseling and, therefore, the juvenile court erred in denying her request to terminate jurisdiction.

We hold that there was sufficient evidence in the record to support the juvenile court's orders denying mother's request to terminate jurisdiction and requiring R.D. and mother to attend counseling. Therefore, the juvenile court did not abuse its discretion in retaining jurisdiction and entering the disposition order requiring counseling.

## FACTUAL AND PROCEDURAL BACKGROUND

This case came to the attention of the Department of Children and Family Services (DCFS) based on a report that father had physically abused R.D. A children's social worker (CSW) interviewed mother who provided the following information. On June 2, 2012, R.D. was visiting his paternal grandmother with whom he stayed periodically because her house was close to his school. During R.D.'s visit that day, father hit him in the eye. Mother took R.D. to the emergency room after the incident. Mother did not have a family custody order for R.D. and did not believe such an order was necessary. Father was not "very involved" in R.D.'s life, and R.D. did not want anything "more to do with father." Following the incident, mother intended to obtain a protective order against father, but at the time of the detention hearing, she had not done so.

The CSW also interviewed R.D. who appeared to be a victim of physical abuse. His left eye was swollen and bloody. According to R.D., prior to the incident, father repeatedly asked R.D. when he was going to leave his paternal grandmother's home.

When R.D. told father that he planned on leaving soon, father "swung at him," and R.D. swung back at father. Father had not hit R.D. like that before. After the "brawl," R.D. went to mother's house. But when the CSW interviewed father, he denied punching R.D. in the eye.

Based on the foregoing information, DCFS filed a petition pursuant to Welfare and Institutions Code section 300.[1] In paragraphs a-1 and b-1, DCFS alleged: "On 06/02/2012, the child, [R.D.]'s father, [M.D.], physically abused the child by repeatedly striking the child's face with the father's fists, inflicting bruising and swelling to the child's left eye. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child does not want to have contact with the father due to the father's physical abuse of the child. Such physical abuse of the child by the father endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger, and physical abuse."

At the detention hearing, the juvenile court found that DCFS had made a prima facie case for detaining R.D. and showing that he was a person described in section 300. The juvenile court further found that a substantial danger existed to the physical or emotional health of R.D., that there were no reasonable means to protect R.D. without removal, and that reasonable efforts had been made to prevent or eliminate the need for R.D.'s removal from father. The juvenile court detained R.D. from father's custody and released him to mother pending the next hearing. The juvenile court also ruled that mother was a nonoffending parent and ordered family maintenance services and a multidisciplinary assessment of R.D. and his family. Father was granted monitored visitation with R.D., and mother was allowed to monitor those visits.

In the jurisdiction/disposition report, DCFS reported that a CSW had conducted a follow-up interview with R.D. during which R.D. provided the following information. The allegations in the petition were true. Father "did bruise [R.D.'s] eye. They did get into a fight." Father was angry with R.D. because he did not "go to court for [R.D.'s]

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

grandma's nephew." Father told R.D. he wanted him to "see how the system [was]." R.D. had been suspended from school and father wanted him "to see what would happen because [R.D.'s] cousin was in jail and scheduled to be in court on that day." When the CSW told R.D. that father was concerned because R.D. "had been smoking weed on the porch," R.D. explained that he and his brother engaged in an argument because his brother mistakenly believed R.D. had been smoking weed. When the CSW told R.D. that father was also concerned because R.D. had been gambling, R.D. admitted to gambling. R.D. explained that he gambled "to have more money in his pocket" to buy a shirt. The school caught R.D. gambling and reported it, so R.D. stopped gambling. R.D. denied father's assertion that R.D. did not follow rules. R.D. had a good relationship with mother, but was living with his paternal grandmother because her house was closer to the night school he was attending. When asked if he and father could ever have a relationship, R.D. replied "no" and explained that his father had little involvement in his life.

Mother provided the CSW with the following information during a follow-up interview. The allegations in the petition were true. One of R.D's eyes was swollen and almost closed. The next day, both of R.D.'s eyes were black and the left eye had "a busted blood vessel." Mother reported that father had "whooped" R.D. in the past, but this was the first time "that something like this took place." In response to father's assertions that R.D. smoked weed, gambled, and disobeyed rules, mother said she had never seen R.D. smoke weed or gamble. When the CSW told mother R.D. had admitted to gambling, mother explained that he "got into trouble at school by hanging with the wrong crowd," but he had not been throwing dice. Mother did not know if R.D. and father could "mend" their relationship. Mother had seen father be violent in the past, but she did not "deal with him." Although father had not been physically violent with mother, he "had a nasty mouth" and was verbally abusive toward her. Mother would choose "not to deal with him when he act[ed] that way."

The CSW conducted a further interview with father who provided the following information. Father denied the allegations in the petition. The incident occurred because

4

R.D.'s paternal grandmother wanted to speak with R.D. about "the house rules." R.D. had moved in to live with the paternal grandmother because he and his brother had a physical altercation. R.D. was on the porch "rolling weed" when his brother approached him and told him mother would be arriving soon. Father usually assisted in managing R.D.'s behavior when R.D. would get into trouble. R.D. was a compulsive liar and gambler who was transferred to continuation school because "he wanted to do what he wanted to do." R.D.'s cousin was incarcerated and scheduled to appear in court on a charge of murder. Father wanted R.D. to go to court to learn from the cousin's mistakes. When the paternal grandmother told father that R.D. had not gone to court, father confronted him. It was possible that R.D.'s eye and his lips were injured during the "tussling," but father did not intentionally hit him. Instead, father was trying to stop R.D. from hitting him. Father and R.D. had never fought like that before. Father said he did not discipline R.D. because he had no control over him and what he said would "not be enforced anyway." R.D. was a year behind in school due to his behavior.

A CSW interviewed the paternal grandmother who provided the following information. The paternal grandmother did not know anything about the allegations in the petition and did not believe that father was "capable of doing something like that." R.D. was disrespectful toward father. At a family meeting, the paternal grandmother and father encouraged R.D. to finish school and told him that they loved him. But what they were saying to R.D. during the meeting "seemed to go through one ear and out the other." R.D.'s attitude toward father during the meeting was bad. R.D. did not "look at father with respect" and displayed a bad attitude that suggested that "he was going to do what he wanted to do and that's it." The paternal grandmother asked R.D. to stop gambling, but he lied about the money he received from his mother.

According to the paternal grandmother, although father was an excellent father to all of his children, mother "put[] a whole bunch of hatred toward father in [R.D.'s] mind." Mother told R.D. that he was considered a "blacksheep" by father's family who did not like R.D. Mother "[fed] a whole bunch of bad stuff about [father's] family to [R.D.]" Nevertheless, father was the first person mother would call when she could not

control R.D.'s behavior. But when father would "step[] in mother [would] intervene[]." She would be loud and disrespectful to father in front of R.D.

The paternal grandmother loved R.D. and wanted him to succeed, but R.D. associated with "gang bangers" at school and liked to gamble. Mother was not training R.D. correctly, and as a result he did not obey the paternal grandmother's rules. The paternal grandmother "could not take the gambling [or the fact] that [R.D.] wanted to hang around with [C]rips and other gangbangers." When the paternal grandmother told R.D. that she had heard he was smoking weed, he denied it, but days later R.D. was "kicked out of school for smoking and gambling."

The CSW reported that R.D. was in the 10th grade and that his last report card showed that he "failed World History, Geometry, Contemporary Comp, Math Tutoring Lab, and ICS, 1-a," "but achieved an 'A' in English and C's in Art and Physical education." According to one of R.D.'s teachers, he needed tutoring and did not participate in class. R.D. had been suspended from school three times between February and June 2012. The first suspension was for committing an obscene act or engaging in habitual profanity or vulgarity; the second and third suspensions were for disrupting school activities or defying the authority of school personnel. The third suspension resulted from R.D.'s "yelling" a gang number and gang name in front of the class.

The jurisdiction/disposition report informed the juvenile court that father was unwilling to reunify with R.D. and wanted no further contact with him. As for mother, she wanted the case closed because she was a nonoffending parent. R.D. did not want any further contact with father.

In the last minute information for the court, a CSW advised that DCFS had decided that voluntary services might be appropriate for this case. When the CSW informed mother about the voluntary services proposal, mother stated that she was not interested and that she would not be attending the jurisdiction/disposition hearing.

At the jurisdiction/disposition hearing, father executed a written waiver of reunification services. After hearing argument, the juvenile court sustained the petition stating: "The court makes the following findings: The court is going to sustain B1 and

6

B2. [T]he PRC report indicates that although this incident has happened once, that inappropriate behavior, inappropriate discussions, this isn't a—isn't a one-time incident. [¶] [Mother] indicates that [father] has not been physically violent towards her, but he has a nasty mouth. [She had] seen him violent. [She doesn't] deal with him. [She doesn't] know if some of the acting out that [R.D.] is doing is a result of his father's inability to safely communicate, but the court does believe that the department needs to step in. [¶] And I'm not clear that this is a one-time incident. I just think that this is one-time it's gotten as bad as it's gotten. So the court is going to sustain the petition as alleged. [¶] . . . I think there are issues. And, with all due respect to [mother], her attitude is it's [father's]. I'm not dealing with [father]. And I don't know how she's dealing with what her son is dealing with. I can't see that she's got him in counseling. I' don't see what's going on with respect to school. [¶] Now, [father] may be addressing it inappropriately, but he has some valid concerns. He's concerned [R.D.] is gambling, and it appears that he is. And I don't see [mother] doing anything about the things that are going on with their son. . . . I'm inclined to provide services. I may not keep the case open that long, but I'm not [willing to terminate jurisdiction] at this point without services in place and an indication from [mother] that she is going to take this seriously."

The juvenile court next considered disposition and mother's testimony, during which she provided the following information: On direct examination, mother denied that she was aware that R.D. was gambling, although she knew he was in a crowd of people who were gambling. As far as she knew, it was a one-time incident for which R.D. was not suspended. Last school year, R.D. had been suspended from Crenshaw High School, but this year he was attending Whitney Young Continuation School. Mother could not remember the reason for R.D.'s suspension from Crenshaw. He had not been suspended at Whitney Young. Mother recalled that R.D. had to stay after school on a detention, but she had not been advised of any other behavioral problems. She did not experience any behavioral problems at home. Mother was not aware that R.D. was using any drugs and she had spoken to him about drug usage. R.D. was in 12th grade, but mother did not believe he was on track for graduation. R.D. did not have excessive

7

absences from school and mother did not have any difficulty parenting him. She communicated well with R.D.

Under questioning from the juvenile court, mother stated that she did not know if R.D. was on track to graduate and she was unsure whether he was a year behind in school. Mother had not spoken to anyone about R.D.'s school attendance since the beginning of school in August. But after further questioning, mother admitted that she "spoke to a teacher a couple of weeks ago and the principal, [she] talked to him often." When the juvenile court advised mother that R.D. admitted gambling and that the school caught him gambling, mother explained that the dean did advise her that R.D. "was with a group of kids that were gambling."

On cross-examination by R.D.'s attorney, mother explained that R.D. had been gambling at Crenshaw, but that she had not been advised he was gambling at Whitney Young. According to mother, the gambling incident at Crenshaw occurred over a year prior and R.D. did not gamble any more.

Following argument, the juvenile court ruled on disposition as follows: "[R.D.] is hereby declared a dependent of the court under Welfare and Institutions Code section 300, subsections (A) and (B). And the court makes the following findings: [Mother] may retain physical custody of her son, but he is placed under the supervision of [DCFS]. Parents continue to hold educational rights on behalf of [R.D.] [¶] Here's the court's rationale: I found the [mother's] testimony to be less than credible. I think that there is some other—not excusing in any way [father's] behavior, but I'm not sure that there aren't some issues and some services needed for [R.D.] [¶] [R.D.] is supposed to be in 12th grade, and he is going to night school, day school, and he still may not graduate because of his behavior in school. And if this was a case where there was going to be voluntary services—I note that [mother] was unwilling to sign a 301 contract. I am concerned that this young man does not necessarily have the support to be on the right road. I don't know what his grand—I mean, it's not a matter of what his grandmother is saying, but what's interesting is [R.D.'s attorney] is telling me that he was only at his grandmother's so that he [could] get up and go to school on time. I note that school

8

seems to be a large vacuum here. I think there are services and [father] may not want reunification services, but he is still this child's father, and I think counseling is more than appropriate. So the court is going to order services. [¶] . . . [¶] All right. The DCFS is asking me to refer this case to . . . [wrap around services]. . . . I refer [R.D.] for individual counseling to address case issues, and he is to be referred for conjoint counseling with his parents if his therapist believes it to be appropriate."

## DISCUSSION

### A.    Legal Principles

The juvenile court removed R.D. from father's custody and placed him with mother pursuant to section 361, subdivision (c)(1) which provides as follows: (c) "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive, and, in an Indian child custody proceeding, paragraph (6): [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with whom the minor resided at the time of injury. The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home. The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."

9

If a child is removed from a parent's custody, child welfare services are mandatory. "[W]henever a child is removed from a parent's or guardian's custody, the juvenile court *shall* order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a) (italics added).) "If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians *shall* be required to participate in child welfare services or services provided by an appropriate agency designated by the court." (§ 362, subd. (c) (italics added).)

### B. Standard of Review

"The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103-1104 [254 Cal.Rptr. 364]; *In re Eric B*. (1987) 189 Cal.App.3d 996, 1005 [235 Cal.Rptr. 22].) We cannot reverse the court's determination in this regard absent a clear abuse of discretion. (*Ibid*.) [¶] The reunification plan '"must be appropriate for each family and be based on the unique facts relating to that family."' (*In re Michael S*. (1987) 188 Cal.App.3d 1448, 1458 [234 Cal.Rptr. 84].) Section 362, subdivision (c) states in pertinent part: 'The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the minor is a person described by Section 300.' (*In re Basilio T*. (1992) 4 Cal.App.4th 155, 172 [5 Cal.Rptr.2d 450].) The department must offer services designed to remedy the problems leading to the loss of custody. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1165 [39 Cal.Rptr.2d 743].)" (*In re Christopher H*. (1996) 50 Cal.App.4th 1001, 1006-1007.)

The juvenile court may make "any and all reasonable orders" to ameliorate the conditions that made the child subject to the court's jurisdiction. (§ 362, subd. (a).) This provision and others in the Welfare and Institutions Code "have been broadly interpreted

10

to authorize a wide variety of remedial orders intended to protect the safety and well-being of dependent children [citation]." (*In re Carmen M.* (2006) 141 Cal.App.4th 478, 486.) The juvenile court must keep in mind the purpose of juvenile dependency law, which is "the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2.)

"'"[A] reunification plan formulated to correct certain parental deficiencies need not *necessarily* address other types of conduct, equally deleterious to the well-being of a child, but which had not arisen at the time the original plan was formulated."' (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1475 [50 Cal.Rptr.2d 385].) However, when the court is aware of other deficiencies that impede the parent's ability to reunify with his child, the court may address them in the reunification plan." (*In re Christopher H., supra,* 50 Cal.App.4th at p. 1008.)


### B.     Analysis

Contrary to mother's assertion, there was sufficient evidence to support the juvenile court's decision to retain jurisdiction and require counseling for R.D. and, if appropriate, for mother. There was evidence that R.D. was smoking marijuana, gambling, and associating with gang members. R.D. had been expelled from his prior high school and had been suspended from his current school on three separate occasions in the four-month period prior to the detention hearing. In addition, R.D. was failing most of his classes, did not follow rules at his paternal grandmother's house, and displayed a  disrespectful and obstinate attitude toward his father's family.

Based on the foregoing evidence, the juvenile court was concerned that at least some of R.D.'s behavioral issues may have been related to his conflict with his father and that the conflict between the two went beyond the incident that brought R.D. to the attention of DCFS. The juvenile court was also concerned that mother was not dealing appropriately with such behavior. It was therefore reasonable for the juvenile court to conclude that R.D. and mother needed and would benefit from individual and conjoint counseling. Although mother and R.D. did not believe counseling was necessary, the

11

evidence supported a reasonable inference R.D.'s best interests would be served by participating in such counseling. Therefore, the juvenile court did not abuse its discretion in retaining jurisdiction and ordering the counseling services in question.

## DISPOSITION

The juvenile court's orders denying mother's request to terminate jurisdiction and requiring R.D. and mother to attend counseling are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

ARMSTRONG, J.